**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JIMMY FERRELL,**

        **Plaintiff,**

                                  **Civil Action 2:13-cv-95**

**v.**                                 **Judge Algenon L. Marbley**

                                  **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Jimmy Ferrell, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 13), the Commissioner's Memorandum in Opposition (ECF No. 22), and the administrative record (ECF No. 10). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.      BACKGROUND

Plaintiff protectively filed his applications for benefits on December 18, 2006, alleging that he has been disabled since November 3, 2004, at age 42. (R. at 195-202.) Plaintiff alleges disability as a result of seizures. (R. at 232.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an Administrative Law Judge ("ALJ"). ALJ Timothy G. Keller held a hearing on August 5, 2009 and subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 98-111.)

On January 20, 2011, the Appeals Council granted review, vacated ALJ Keller's decision and remanded the matter to him to evaluate Plaintiff's history of basal cell carcinoma and mental impairment, as well as the opinion of treating physician, Dr. Kanneganti.  (R. at 112-15.) Pursuant to the Appeals Council's order, ALJ Keller held a hearing on May 24, 2011 (R. at 59-73), and subsequently found that Plaintiff was not disabled.  (R. at 35-51.)  The Appeals Council denied Plaintiff's request for review.  (R. at 1-6.)  ALJ Keller's decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

## II.   HEARING TESTIMONY

### A.    Plaintiff's Testimony

At the May 24, 2011 administrative hearing, Plaintiff testified that he stopped working in 2004 because his seizures had become too severe.  (R. at 62.)  Plaintiff averred that his previous job as a detailer required him to drive cars daily to the frame shop, to the alignment shop, and to drive customers home.  (R. at 62-63.)  Plaintiff testified that his last seizure prior to the hearing occurred in March 2011 and lasted more than ten minutes.  (R. at 63.)  According to Plaintiff, has since been prescribed injectable medication for seizures lasting longer than five minutes.  (*Id.*) Plaintiff testified that he also had a seizure in November 2010, but does not remember what occurred.  (R. at 64.)  He testified that he periodically has small episodes that are not full-blown seizures.  (R. at 64-65.)  He indicated that these episodes occur two to three times weekly, lasting five to thirty minutes.  (*Id.*)

Plaintiff also testified to experiencing daily headaches during daylight hours.  (R. at 65.) He noted that he constantly wears sunglasses or stays in a dark room "because the headaches are so bad."  (*Id.*)  He testified that he normally awakes at 12:30 p.m. with a headache.  He stated that his headaches get worse throughout the day.  (*Id.*)  Plaintiff indicated that he was previously

prescribed Percocet for his headaches, but his physician took him off of the medication out of

fear he would become addicted.  (R. at 66.)  Plaintiff rated his daily headache pain at a level of

eight on a 0-10 visual analog scale, noting that his pain is at a level of ten about three to five

times per month.  (*Id.*)  These headaches are so severe that he must lie down for several hours.

(R. at 66-67.)

   Plaintiff testified that he was taking Imitrex, aspirin, Trazadone, Gabapentin, Propranolol

and Topamax for treatment of his seizures and headaches.  (R. at 67-68.)  At the time of the

hearing, Plaintiff had a driver's license.  (R. at 68.)  He testified that he drove about once per

month to a gas station to buy cigarettes.  (*Id*.)

**B.     Vocational Expert Testimony**

   Bruce Growick testified as the Vocational Expert ("VE") at the May 24, 2011

administrative hearing.  (R. at 70-72.)  The ALJ asked the VE to determine if there was any work

in the regional or national economy that a hypothetical person of Plaintiff's age, educational

background, and work experience could perform with the following limitations: that he never

climbs any ladder, rope or scaffold, and that he had no exposure to moving machinery or

unprotected heights.  (R. at 70.)  Based on this hypothetical, the VE acknowledged that Plaintiff

could perform his past relevant work of a car detailer, but not as a driver.  (R. at 71.)  The VE

further testified that Plaintiff could also perform light strength jobs such as a laundry worker,

with 700 local jobs, and basic assembly work, with 3,200 local jobs.  (*Id.*)  There would be a

multiplier of 16 and 256 for the number of jobs in the state and nation respectively.  (*Id.*)  When

asked about being off task for an hour per day, the VE testified that it would be work preclusive.

(R. at 72.)

### III.    MEDICAL RECORDS

**A.    Physical Impairments**

Plaintiff has suffered from epilepsy since he was seventeen years old.  He presented to the emergency room in September 2006 after he fell and landed on his concrete porch.  (R. at 431.)  Plaintiff indicated that he had run out of his Dilantin a few days prior and had been taking his mother's Dilantin.  (*Id.*)  A CT of his brain showed no abnormalities. (R. at 435.)  He was discharged with a refill of his Dilantin prescription.  (R. at 432.)  Plaintiff returned to the emergency room in December 2006 after having seizure activity.  (R. at 419-29.)  Plaintiff reported an increased frequency of seizures since September of that year.  (R. at 420.)  He also reported that although he had been noncompliant in the past with his Dilantin, he had taken it faithfully for two months.  (R. at 420.)  Plaintiff reported having a generalized throbbing headache after a seizure.  He also reported marijuana use but denied any recent increase in this use. (*Id.*)

**1.    Columbus Neurology**

Plaintiff was seen by neurologist Prasad Kanneganti, M.D on January 12, 2007, after experiencing a seizure on January 8, 2007.  (R. at 586-87.)  Plaintiff indicated that his seizures had been more frequent since September 2006 and occurred as often as every three weeks. Prior to this, Plaintiff reported that his seizures occurred once every six months.  (*Id.*)  Plaintiff also reported that he had been driving until recently and was not aware that he should refrain from driving because of the frequency of his seizures.  Dr. Kanneganti noted that Plaintiff's Dilantin level was low for therapeutic efficacy and increased his dosage to 500 mg.  (R. at 587.)  He also prescribed Plaintiff Klonopin for insomnia.  (*Id.*)

On March 30, 2007, Dr. Kanneganti diagnosed complex partial seizures with secondary generalization and intractable epilepsy. He recommended that Plaintiff obtain Medicaid to allow for additional medications, emphasizing that it was important for Plaintiff to comply with the medications. Dr. Kanneganti also requested that Plaintiff keep a seizure log to bring to a follow-up visit. (R. at 585.) On April 18, 2007, Plaintiff reported two seizures immediately after the last office visit, with jerking in all four extremities, drooling, making grunting noises, and confusion that lasted 10-15 minutes. Dr. Kanneganti added Topamax to Plaintiff's medications. Dr. Kanneganti repeatedly asked Plaintiff to find a primary physician and to obtain Medicaid so that he could obtain his medications for free. (R. at 584.) On May 15, 2007, after reporting no seizure activity since the last visit, Plaintiff was placed on a one year follow-up. (R. at 583.)

On September 21, 2007, Steven Simensky, M.D., Ph.D., assumed care of Plaintiff. (R. at 581-82.) Plaintiff reported his last seizure occurred during the summer, while mowing grass. He was not driving, and Dr. Simensky recommended he not drive until his seizures were better controlled. Dr. Simensky tapered Plaintiff off Dilantin, even though it worked well for him, as it was not a good drug for long term use, and substituted Topamax. (*Id.*)

On January 11, 2008, Plaintiff reported his last seizure was in November of the previous year. He also complained of headaches since October, noting they were typically at a level of five to six out of ten. Dr. Simensky increased Plaintiff's Topamax dosage and decreased the Dilantin. (R. at 577-78, 580.)

When seen on April 18, 2008, Plaintiff reported an episode in which everything appeared in slow motion, without loss of consciousness, but with problems concentrating. He also reported having panic attack symptoms in February and experiencing daily headaches, lasting half a day to all day, in which he became nauseated and sometimes vomited. Dr. Simensky

5

continued Topamax for both epilepsy and headaches, discontinued Dilantin, and started Depakote. (R. at 574-75.) Plaintiff was still experiencing near-daily headaches in September 2008, with an intensity of six out of ten and associated with photophobia. He also reported drinking ten cans of Mountain Dew per day. Dr. Simensky recommended decreased caffeine consumption in the hope it would lessen the headaches. (R. at 571-72.)

On January 9, 2009, Plaintiff described two seizure-like episodes (which he refers to as "spells"). (R. at 799.) Both involved early morning shortness of breath, racing heart, and inability to move his body with preservation of consciousness that lasted 2-3 minutes. Plaintiff immediately returned to normal cognition thereafter. Plaintiff also reported that his headaches had improved since he started Topamax and that he had not needed his Imitrex for a month. (R. at 799-800.)

On May 15, 2009, Plaintiff again reported that his headaches had improved since starting on Topamax. (R. at 797.) On November 10, 2009, however, Dr. Simensky noted that Plaintiff's seizures were well controlled but the headaches had worsened. (R. at 845.) Plaintiff reported his headaches at 6-8 out of 10 every day for the preceding several months. (*Id.*) Dr. Simensky continued Topamax, and added Amitriptyline for headaches, insomnia and depression. (*Id.*) In February 2010, Plaintiff reported a breakthrough seizure on December 1, 2009, after which he stopped Amitriptyline. Plaintiff still reported daily headaches at 6 out of 10 in intensity. Dr. Simensky continued Topamax and started Plaintiff on Neurontin for headaches and breakthrough seizures. (R. at 844.) The record shows Plaintiff continued to treat with Dr. Simensky through at least February 2012. (R. at 941-48, 1067-70, 1073-74, 1076-77.) Dr. Simensky continued to adjust Plaintiff's medications to help with his chronic headaches. (*Id.*)

## 2. Grant Medical Center

Plaintiff presented to the emergency room on April 1, 2010, for a breakthrough seizure with a fall and head contusion. (R. at 848-55.) He reported that he had been compliant with his medications. Plaintiff's lab work was normal and a CT of his brain showed a sphenoid sinusitis. (R. at 851-53.) He was treated with antibiotics and released to follow up with his neurologist. (R. at 850.)

## 3. Andrew Kopperud, M.D./Montoya Taylor, M.D. at Nationwide Children's Hospital

Dr. Kopperud and Dr. Taylor, Plaintiff's primary care physicians, treated Plaintiff under the diagnoses of seizure disorder, headaches, hypertension, and depression. (R. at 484-565, 599-698, 705-89, 804-38, 870-99, 949-1047.) Specifically, in November 2007, Plaintiff reported worsening headaches with Zoloft at nighttime, which was discontinued. He rated the severity of headaches at five out of ten. (R. at 547.) In December 2007, Plaintiff continued to report worsening headaches at night after discontinuing Zoloft. He had a normal neurological examination. Dr. Kopperud assessed headaches as "likely tension, however, could be migraine as well." (R. at 536.)

On January 17, 2008, Plaintiff reported to Dr. Kopperud that he had a seizure three days prior that lasted for five or six minutes. (R. at 529.) Plaintiff indicated that he gets four to six hours of sleep per night and drinks four to five cans of Mountain Dew per day. (R. at 530.) He had been off of caffeine for three days at the time of his visit. (*Id.*) Plaintiff agreed to try Imitrex for headaches. His physical and neurological examinations continued to be normal.

In June 2008, Plaintiff reported to that he was not having seizures with Depakote and Topomax. He reported that he continued to have headaches and that Imitrex worked to control the severe ones. He reported dizziness with Imitrex but no problems with his seizure

medications. (R. at 602.) In October 2008, Plaintiff reported that his migraine headaches were well controlled on Verapamil and Imitrex. (R. at 716.) Treatment notes from December 2008 through April 2009 show Plaintiff's headaches were occasional, mild, and considered well-controlled. (R. at 817, 825, 830-31.) Dr. Kopperud indicated that Plaintiff's seizures were stable, despite occasional spells with unclear etiology. (R. at 817.) Plaintiff was taken off of Depakote completely and taking Topomax twice daily. (R. at 805.) In May, he reported that his headaches had worsened over the previous two weeks. (*Id.*) By June 2009, he reported his headaches as "more stable." (R. at 884.) In July 2009, Plaintiff reported that his overall health had improved. (R. at 877.)

In March 2010, Dr. Kopperud reported in a medical source statement that Plaintiff had intermittent seizures, with the most recent on March 21, 2010. According to Dr. Kopperud, Plaintiff had daily migraine headaches which limited his activities. Dr. Kopperud also found that Plaintiff suffered from chronic depression due to his medical illness. Dr. Kopperud noted that Plaintiff's medications were adjusted as needed, in conjunction with Dr. Simensky. Although symptoms were improved, headaches continued on a nearly daily basis, and seizures occurred every one to four months. Dr. Kopperud reported that Plaintiff was timely, compliant with medication, and followed-up as advised. (R. at 937-38.)

Plaintiff reported to Dr. Taylor in May 2010, that he was frustrated with disability process and with his neurologist's indication that he could return to work. Dr. Taylor noted that Plaintiff's headaches were overall controlled. (R. at 1018.) In July 2010, Plaintiff reported assisting his sister with manual labor and developing a ten out of ten headache. He also reported that his headaches were worse with exposure in the sun. He has continued to take medication and rated his baseline at five to six out of ten. (R. at 1010.) Plaintiff was given a refill for

Imitrex and Vicodin on an as needed basic.  (R. at 1012.)  In October 2010, he complained of worsening headaches, but reported not using Imitrex recently. (R. at 998.)

### 4.  W. Jerry McCloud, M.D.

In May 2007, State Agency physician Dr. McCloud reviewed the record and assessed Plaintiff's physical functioning capacity.  (R. at 467-74.)  Dr. McCloud opined that Plaintiff had no exertional limitations.  (R. at 468.)  According to Dr. McCloud, Plaintiff could never climb ladders, ropes or scaffolds due to seizures and should avoid all exposure to heights and hazards. (R. at 471.)  When discussing Plaintiff's symptoms, Dr. McCloud noted that Plaintiff is not compliant with medications.  (R. at 472.)  In August 2007, state agency physician, Cindi Hill, M.D. affirmed Dr. McCloud's assessment.  (R. at 483.)

### 5.  Diane Manos, M.D.

In February 2010, state agency physician, Dr. Manos, reviewed the record and assessed Plaintiff's physical functioning capacity.  (R. at 912-19.)  Dr. Manos opined that Plaintiff had no exertional limitations.  (R. at 913.)  According to Dr. Manos, Plaintiff could never climb ladders, ropes or scaffolds and should avoid all exposure to heights, dangerous machinery and commercial driving.  (R. at 914, 916.)  When discussing Plaintiff's symptoms, Dr. Manos observed that:

> [Plaintiff] has history of well controlled seizures with his last seizure reported in November 2008.  All neuro[logical] exams have been normal and he is responding well to all medications.  [Plaintiff] further alleges that he has migraines and his migraines are the main factor that limits his ability to work because he has them every day and they last all day long with intense migraines that can last 2-3 hours on occurrence.  As a result of his symptoms [Plaintiff] sits around and all day and watches TV depending on how his head is feeling.  He states the sunlight aggravates his impairment and he needs to wear sunglasses at all times when outside.

(R. at 917.) Dr. Manos noted Plaintiff's symptoms are attributable to a medically determinative impairment but the severity of his symptoms is disproportionate to the expected severity when compared to the medical evidence. All of Plaintiff's neurologic examinations have been normal and Plaintiff responds well to his medications. Dr. Manos found Plaintiff only partially credible because he states that he is unable to do anything; however since his seizures and migraines are controlled with medication his function should not be limited as severely as Plaintiff describes. Dr. Manos indicated that Plaintiff might have to work in an environment without bright light. (R. at 917.) In May 2010, State Agency physician, Dimitri Teague, M.D. affirmed Dr. Manos' assessment. (R. at 940.) Dr. Teague noted that the criteria in Listing 11.02 and 11.03 can only be applied if a claimant's seizures occur more frequently than once weekly in spite of at least three months of prescribed treatment. In this case Plaintiff has not experienced seizures more than once weekly. (*Id.*)

**B.  Mental Impairments**

**1.  Kent Rowland, Ph.D.**

On January 26, 2010, Dr. Rowland examined Plaintiff on behalf of the state agency. (R. at 901-08.) Plaintiff reported that he has experienced seizures since he was 18 years old and suffered from depression for the two years prior to the examination. (R. at 902.) Plaintiff reported feeling sad, blue, pessimistic, and discouraged all the time. He had no interest in normal activities and no energy. He felt helpless and worthless and his appetite was poor. He needs medication to sleep at night, but noted that the medications did not help the depression. He has never received formal mental health treatment. (*Id.*)

Plaintiff lived with his mother and spent most of his time lying down or watching television. During the summer he might go outside to do yard work. He generally awoke

between 10:30 a.m. and 1:00 p.m.  He cleaned his own bedroom and maintained self-care without assistance, but rarely drove due to seizures.  (R. at 904-05.)  On mental status examination, Plaintiff reported occasional crying spells and occasional suicidal thoughts.  He noted he only slept well on medication.  Dr. Rowland found both his long and short-term memory was poor, his concentration was below average, and he sometimes lost his train of thought.

Dr. Rowland diagnosed Plaintiff with major depressive disorder, single episode, moderate severe without psychotic features, and anti-social and dependent features.  (R. at  907-08.)  Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 55.[1]  Based on his significant difficulty with short and long term memory, and attention and concentration problems, Dr. Rowland recommended a cognitive assessment to evaluate deficits secondary to the seizure disorder.  (R. at 907.)

Dr. Rowland opined that Plaintiff's ability to understand, remember, and follow instructions was moderately impaired by difficulties with concentration and short-term memory. Dr. Rowland indicated that Plaintiff's intense approach to the interview process suggested an attempt to compensate for memory and concentration difficulties.  According to Dr. Rowland, Plaintiff's ability to maintain attention, concentration, persistence and pace to perform routine tasks was impaired by lack of motivation and energy associated with his depression. Dr. Rowland also opined that Plaintiff's ability to relate to others, including coworkers and

---

[1]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of  51-60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  DSM-IV-TR at 34.

supervisors, was moderately impaired due to his history of explosive behavior with others.  He

further opined that Plaintiff's mental ability to withstand the stress and pressure associated with

day-to-day work activity was moderately impaired by his depression.  (R. at 908.)

### 2.    Cynthia Waggoner, Psy.D.

Dr. Waggoner, a State Agency psychologist, assessed Plaintiff's mental condition on

February 28, 2010.  (R. at 912–36.)  After a review of Plaintiff's medical record, Dr. Waggoner

found that Plaintiff had mild restrictions of activities of daily living and moderate difficulties in

maintaining concentration, persistence or pace and in maintaining social functioning.  (R. at

934.)  When assessing Plaintiff's mental residual functional capacity, Dr. Waggoner found

moderate impairments in the following areas: (1) following detailed instructions; (2) maintaining

attention and concentration for extended periods; (3) working in coordination with or proximity

to others without being distracted by them; (4) completing a normal work day and work week

without any interruption from psychological based symptoms; (5) interacting appropriately to

criticism from supervisors; (6) getting along with coworkers or peers without distracting them;

and (7) responding appropriately to changes in the work setting.  (R. at 920-21.)  Dr. Waggoner

gave weight to Dr. Rowland's assessment and noted Plaintiff's allegations were partially

credible.  (R. at 923.)

## IV.  THE ADMINISTRATIVE DECISION

On June 24, 2011, the ALJ issued his decision.  (R. at 35-51.)  At step one of the

sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential
evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step
terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully
considered, the sequential review considers and answers five questions:

    1.    Is the claimant engaged in substantial gainful activity?

gainful activity since November 3, 2004.  (R. at 40.)  The ALJ found that Plaintiff had the severe impairments of epilepsy and headaches.  (*Id.*)  The ALJ further found that Plaintiff's history of basal cell carcinoma, hypertension, and depression are not severe impairments.  (R. at 41.)  The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 43.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[3] and determined that Plaintiff can perform a full range of work at all exertional levels, but was limited to no climbing of ladders, ropes or scaffolds and no exposure to moving machinery and unprotected heights. (*Id.*)  In reaching the determination, the ALJ gave "great weight" to the opinions of Drs. McCloud, Hill, and Teague.  (R. at 49.)  The ALJ assigned "little weight" to the opinion of Dr. Kopperud, finding that his statements did not describe how Plaintiff's symptoms could affect his ability to work or perform daily activities.  (R. at 49.)  The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  The ALJ, however, determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms are not

---

2.      Does the claimant suffer from one or more severe impairments?
3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[3]The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

credible to the extent they are inconsistent with the above residual functional capacity assessment.  (R. at 47.)

Relying on the VE's testimony, the ALJ determined that Plaintiff was capable of performing his past relevant work as an auto detailer/cleaner as generally performed, as well as other jobs that exist in significant numbers in the state and national economy.  (R. at 49-50.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 51.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  ANALYSIS

As a preliminary matter, the Court will not consider Exhibits 35F, 36F, and 37F, which are medical records from the Ohio State University Neurology Outpatient Clinic dated October 30, 2011 and medical records from Columbus Neurology & Neurosurgery dated June 13, 2011, September 26, 2011, December 15, 2011, and February 13, 2012.  These documents were supplemented at the Appeals Council stage.  The Appeals Council, however, declined to review Plaintiff's application for disability insurance benefits on the merits.  This Court, therefore, cannot consider the new evidence.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (concluding that "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision").  Although the Court could remand for further administrative proceedings in light of the new evidence, Plaintiff has not shown that the evidence is new and material.  Nor has he shown that there was good cause for not presenting it in the prior proceeding.  *See id.* (noting that the district court can "remand the case for further administrative proceedings in light of the [new] evidence, if a clamant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding.").  The records at issue here merely

summarize Plaintiff's seizure activity and provide a possible diagnosis for his headaches. Sufficient objective medical evidence exists in the current record to address both of these areas. Because the medical records in Exhibits 35F, 36F, and 37F are not new and material, the Court will not remand for further administrative proceedings. Instead, the Undersigned will not consider those documents to assess whether to uphold, modify, or reverse the ALJ's decision

In his Statement of Errors, Plaintiff asserts that the ALJ erred by merging the evaluations of Plaintiff's seizures and headaches to conclude that because the seizures were controlled with medication, the headaches were likewise controlled. (ECF No. 13.) Plaintiff further asserts that the ALJ erred by not fully considering the limitations imposed by Plaintiff's depression. The Court will address each objection in turn.

## A.     Headaches

Plaintiff asserts that the ALJ conflated his two severe impairments: his seizures, which are well controlled by medication; and his headaches, which he asserts are not controlled by medication. He argues that the ALJ "did not adequately cover the limitations from frequent debilitating headaches" in his RFC. (Stmt. of Errors 1, ECF No. 13.) Plaintiff indicates that the ALJ failed to assess the frequency and duration of his headaches and asserts that the evidence establishes that Plaintiff is unable to "maintain a work schedule with an absence rate consistent with competitive employment." (*Id.* at 2.)

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v.*

*Astrue*, No. 1:09CV000411, 2010 WL 3730983, at \*8 (S.D. Ohio June 18, 2010).  When

considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the

temptation to play doctor and make their own independent medical findings.'"  *Simpson v.*

*Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d

966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at

\*10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in

functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she set

forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the
> evidence supports each conclusion, citing specific medical facts (e.g., laboratory
> findings) and nonmedical evidence (e.g., daily activities, observations).    In
> assessing RFC, the adjudicator must discuss the individual's ability to perform
> sustained work activities in an ordinary work setting on a regular and continuing
> basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and
> describe the maximum amount of each work-related activity the individual can
> perform based on the evidence available in the case record. The adjudicator must
> also explain how any material inconsistencies or ambiguities in the evidence in
> the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at \*6–7 (internal footnote omitted).

In this case, substantial evidence supports the ALJ's assessment of the impact of

Plaintiff's headaches on his RFC.  The ALJ provided a significant narrative discussion as to how

he arrived at Plaintiff's RFC determination as it relates to his headaches.  Although the ALJ did

at some points conflate the diagnosis and treatment of Plaintiff's headaches, this dual analysis

was due to the fact that Plaintiff's headaches often occurred immediately following a seizure.

The record shows that the treatment for Plaintiff's headaches was initially intertwined with his

treatment for seizures.  (R. at 44.)  The ALJ addresses Plaintiff's headaches frequently

throughout the decision and cites both medical and non-medical evidence as well as Plaintiff's

testimony. He addresses the onset of Plaintiff's headaches in October 2007. (R. at 45.) He addresses Plaintiff's "near daily" headaches and his normal MRI and EEG findings in 2008. (R. at 44.) The ALJ cites to Plaintiff's self-report that his headaches do not usually interfere with his daily activities. (R. at 45.) He refers to Plaintiff's 2009 report that his headaches were improved and that he had not needed to use Imitrex. Further, the ALJ found that Plaintiff was not fully credible due to, among other things, his use of Aspirin for what Plaintiff considers severe and debilitating headache pain and his inconsistent statements regarding his ability to perform daily activities with the headaches. *See* 20 C.F.R. § 404.1529 (c)(3) (indicating factors the ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities, the effectiveness of medications, and treatment other than medication). The ALJ therefore supported his RFC determination by providing a sufficient narrative discussion of Plaintiff's headaches.

**B.     Depression**

Plaintiff's objection based on the ALJ's treatment of his depression is not completely clear. As best as the Court can discern, Plaintiff contends that the ALJ erred by not giving sufficient weight to the opinions of Dr. Rowland and State Agency reviewing psychologist Dr. Waggoner. For the reasons that follow, the Court concludes that the ALJ sufficiently considered all of the medical opinions.

Dr. Rowland saw Plaintiff once on January 26, 2010 at the request of DDS. Dr. Rowland diagnosed Plaintiff with major depressive disorder, single-episode, moderate-severe without psychotic features. (R. at 907.) The ALJ afforded Dr. Rowland's opinion "little weight" because it was based on Plaintiff's self-report and was inconsistent with the other evidence in the record. After a review of Plaintiff's record, Dr. Waggoner opined that he was moderately limited in his ability to withstand the stress of day to day work activity. (R. at 922.) The ALJ afforded

Dr. Waggoner's opinion "little weight" because it was "inconsistent with the overall evidence of record and claimant's own reports of ability to get along with others."  (R. at 42.)

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).  "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 CFR § 404.1527(e)(2)(i).  The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408.  To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant.  20 C.F.R. § 404.1502.

Dr. Rowland was not Plaintiff's treating physician.  His opinion, therefore, was not entitled to controlling weight.  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (concluding that a psychologist "paid for by the Social Security Administration to examine [plaintiff] on one occasion" was not a treating physician).  The ALJ adequately considered the opinions of both Drs. Rowland and Waggoner and afforded them little weight as inconsistent with the rest of the evidence in the record.

19

**C.** **Substantial Evidence Supports the ALJ's Conclusions**

Substantial evidence supports the ALJ's conclusions with respect to Plaintiff's RFC. First, sufficient evidence in the record supports the finding that Plaintiff's headaches, though chronic, were controlled by medication. (*See, e.g.,* R. at 602, 716, 797, 811, 813.)  On October 6, 2010, Plaintiff indicated that although Imitrex helped with his most severe headaches, he had not used Imitrex recently.  (R. 998.)  Plaintiff reported that his treating neurologist indicated that he could return to work.  (R. 1018.)  Plaintiff also indicated that he can usually perform daily activities with the headaches.  (R. 571.)  Overall, substantial evidence supports the ALJ's RFC determination with regard to Plaintiff's headaches.

Furthermore, substantial evidence supports the ALJ's determination that Plaintiff's depression only minimally interferes with Plaintiff's ability to work.  Dr. Rowland indicated that Plaintiff was "alert and oriented," fully intelligible, and his social skills were good.  (R. 905-06.) Plaintiff suffered no episodes of decompensation and had not had any hospitalizations for mental health problems.  As indicated by the record, Plaintiff actively sought out treatment for most of his symptoms, but did not seek out counseling for his depression.  *Strong v. Social Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (noting that a failure to seek treatment "may cast doubt on a claimant's assertions").  Plaintiff's primary care physician prescribed Celexa and Plaintiff indicated improvement in his symptoms.  (R. 873, 878, 941.)  A review of the entire record demonstrates that substantial evidence supports the ALJ's determination with regard to Plaintiff's RFC.

## VII.  CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is

**RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date:   July 29, 2014                              _____/s/ *Elizabeth A. Preston Deavers*
                                                                    Elizabeth A. Preston Deavers
                                                                    United States Magistrate Judge